SAGINAW MANUFACTURING CO. *v.* SECRETARY OF STATE.

CORPORATIONS—PRIVILEGE FEE—BONDS WITHOUT STATE NOT EX-
EMPT.

> Bonds bought outside the State by a domestic corpora-
> tion, and kept outside, are not property or capital outside
> the State within the meaning of Act No. 85, Pub. Acts
> 1921, § 5, exempting from computation, in· fixing the
> privilege fee to be paid under the provisions of said act,
> property or capital of such corporation located without
> the State.

Mandamus by the Saginaw Manufacturing Company
to compel Charles J. DeLand, secretary of State, to
accept and file a report under the provisions of Act
No. 85, Pub. Acts 1921.    Submitted October 9, 1923.
(Calendar No. 30,806.)    Writ denied January 7,
1924.

*Humphrey, Grant & Henry,* for plaintiff.

*Andrew B. Dougherty,* Attorney General, *Clare
Retan,* Deputy Attorney General, and *J. E. Converse,*
Assistant Attorney General, for defendant.

MOORE, J.    The plaintiff asks for the writ of
mandamus to compel the secretary of State to accept
and file its report of June 30, 1922, without requiring
it to pay a privilege tax on $463,846.25 of bonds
owned by it outside of the State.

This litigation requires a construction of some of
the provisions of Act No. 85, Pub. Acts 1921 (Comp.

On situs, for taxation, of tangible personal property of domestic
corporation, see note 69 L. R. A. 431.

*Continued from Vol. 225.

Laws Supp. 1922, § 11361 [1-14]). The title of the act in part is:

"An act prescribing the fees, taxes and charges to be paid to the State by corporations doing or seeking to do business in this State." * * *

Section 4 of the act reads:

"SEC. 4. Every corporation organized or doing business under the laws of this State, excepting those hereinafter expressly exempted therefrom, shall, at the time of filing its annual report with the secretary of State of this State, as required by section seven hereof, for the privilege of exercising its franchise and of transacting its business within this State, pay to the secretary of State an annual fee of three and one-half mills upon each dollar of its paid-up capital and surplus, but such privilege fee shall in no case be less than fifty dollars nor more than ten thousand dollars."

Section 5 reads in part as follows:

"SEC. 5. In the case of computing the privilege fees prescribed in sections three and four of this act as to foreign corporations, such computation shall be made upon the proportion of the corporation's property owned and used in Michigan in the ratio that such property bears to the entire property of the corporation, and such ratio shall be applied by the secretary of State to determine the amount of the authorized capital stock of such corporation owned and used in Michigan, and to determine what portion of the corporation's paid-up capital and surplus, severally, are owned and used in Michigan. The term 'surplus' as used in this act, shall be taken and deemed to mean the net value of the corporation's property, less its outstanding indebtedness and paid-up capital; but in no case, either as to domestic or as to foreign corporations, shall any deduction be made from the item of paid-up capital, in computing the privilege fee thereon, by reason of any impairment of the same. None of the property or capital, of any corporation subject to paying the privilege fee prescribed in section four which is located without the State of Michigan,

and none of the capital or surplus of such corporation represented by property exclusively used in interstate commerce, shall in any case enter into the computation of the net amount of the authorized capital, or the capital and surplus, as the case may be, upon which the computation of the privilege fees shall be made."    *    *    *

The facts are not in dispute.    The report shows that plaintiff's place of business is Saginaw, Michigan; that it is engaged in the manufacture and sale of pulleys and washboards; that it has no real estate outside of Michigan, that it has no personal property outside of Michigan except the bonds mentioned.    As to those bonds its claim is stated in its petition as follows:

"Petitioner further shows that in August, 1920, there occurred a severe depression in the general business of the country, which caused the business of the country to almost come to a standstill.    By reason of that depression, petitioner was unable to market and sell its manufactured products and by reason thereof was obliged to and did curtail and cut down its manufacturing operations to the lowest point possible under which the plant could be kept in operation at all with any semblance of economy whatever and even then it was unable to market a considerable portion of its output and the same accumulated.    Petitioner kept its manufacturing plant in operation under those conditions until February, 1921, when there occurred a revival in the general business of the country and petitioner was enabled to resume its normal operations.    When the depression occurred in August, 1920, petitioner was under contract obligations for the purchase of very large quantities of raw materials for use in its manufacturing business and it was obliged to and did carry out those contracts, take in and pay for the materials so purchased.    The result was when business revived in February, 1921, it had on hand a large quantity of the manufactured products ready for sale and also a large quantity of raw materials sufficient to meet the requirements for some time.    At the end of the

year 1920, its inventory showed that it had on hand of manufactured and unmanufactured material between five and six hundred thousand dollars worth. On the revival of business as before stated, petitioner was able to and did sell and market its manufactured products then on hand as well as its output, and not being obliged to buy raw material, the money from the sales of its products began to very rapidly accumulate and the profits realized were large and a surplus in money not required or needed in the business of the company was rapidly accumulated. Shortly after such surplus began to accumulate, petitioner adopted the policy of appropriating and setting aside a portion of the surplus as it accumulated as a reserve fund and investing it in securities. That policy has ever since been adhered to. The reserve fund so established was intended to be held and is held for the purpose of rebuilding and replacement of its manufacturing plant in case of destruction by fire or the elements and for the purpose of fortifying the petitioner in the event of another disastrous depression in business such as began in August, 1920, and tiding it over such period without being required to borrow large sums of money at increased interest rates when it is very difficult to borrow money at all. This plan was adopted by petitioner as a sane and sound business policy."

The bonds were never in the State of Michigan, but were bought and kept in Chicago, but are subject to the direction and control of the plaintiff, and might be brought into the State at any time if desired by the plaintiff.

It is the claim of the plaintiff, because of the following language in section five, that it is not required to pay a privilege tax on the bonds in question:

"None of the property or capital, of any corporation, subject to paying the privilege fee prescribed in section 4 which is located without the State of Michigan * * * shall in any case enter into the computation óf the net amount of the authorized capital or of the capital and surplus as the case may be upon which the computation of the privilege fees shall be made."

Counsel have prepared very elaborate briefs, but none of the authorities cited is controlling. The case as here presented is one of first impression in this State. If these bonds had been bought and held in this State, we do not think it would be claimed they would not be subject to the privilege tax.

Can the plaintiff escape the tax, though the bonds are part of its assets, by buying and keeping them outside the State? We think it clear that the bonds are not property or capital outside the State within the meaning of the statute, which will exempt them from paying the privilege fee.

The application for the writ of mandamus is denied, with costs to the defendant.

Clark, C. J., and McDonald, Bird, Sharpe, Steere, Fellows, and Wiest, JJ., concurred.